**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 22-5251**

———————————————

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

**TSUNAMI KHAN, ALSO KNOWN AS MICHAEL S. OWLFEATHER-GORBEY,**
Plaintiff – Appellant,

**v.**

**AVERY, CAPT, USP THOMPSON, ET AL.,**
Defendants – Appellees.

———————————————

**Appeal from the United States District Court
for the District of Columbia**

———————————————

**REPLY BRIEF OF AMICUS CURIAE IN SUPPORT OF
APPELLANT TSUNAMI KHAN**

Erica Hashimoto
*Director*

Eva Shell
*Supervising Attorney*

Alexis R. Casanas
Sonia Geba
*Student Counsel*

Georgetown University Law Center
Appellate Litigation Program
111 F Street NW, Suite 306
Washington, D.C. 20001
(202) 662-9555
eh502@georgetown.edu

*Counsel for Amicus Curiae
in Support of Appellant*

February 29, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... ii

GLOSSARY OF ACRONYMS ................................................................ iv

STATUTES AND REGULATIONS ........................................................ v

SUMMARY OF THE ARGUMENT .......................................................... 1

ARGUMENT ................................................................................. 4

  I.   THE GOVERNMENT RECOGNIZES MR. KHAN'S IMMINENT DANGER OF BLINDNESS FROM GLAUCOMA EVEN WHILE ERRONEOUSLY CONTESTING NEXUS. ........................................... 4

    A.   Nexus does not require a showing of redressability for imminent danger allegations, but even if this Court adopts such a standard, Mr. Khan satisfies it. ................................................................... 5

    B.   The government fails to address the core of Mr. Khan's allegations—that he was consistently denied necessary treatment for his glaucoma. ................................................................... 7

  II.   THE GOVERNMENT DOWNPLAYS THE ROLE OF PRISON OFFICIALS IN FACILITATING AND ENCOURAGING ASSAULTS AT USP THOMSON. ................................................................ 11

  III.   THE GOVERNMENT'S PROPOSALS WOULD TRANSFORM THE IMMINENT DANGER EXCEPTION INTO AN UNWORKABLE STANDARD. ...................................................................... 14

    A.   The government's proposed standard is unsupported and contradicts established law. ............................................................. 15

    B.   This Court already has tools to screen meritless cases, rendering the government's proposals superfluous. ........................................ 22

CONCLUSION ............................................................................ 24

CERTIFICATE OF COMPLIANCE...................................................... 25

CERTIFICATE OF SERVICE............................................................. 26

# TABLE OF AUTHORITIES

## Cases

*Abdul-Akbar v. McKelvie*, 239 F.3d 307 (3d Cir. 2001) ............................ 7

*Andrews v. Cervantes*, 493 F.3d 1047 (9th Cir. 2007) ...................... 10, 21

*Asemani v. U.S. Citizenship & Immigration Servs.*, 797 F.3d 1069 (D.C. Cir. 2015) ...................................................................................... 18, 19

*Ball v. Famiglio*, 726 F.3d 448 (3d Cir. 2013) .................................. 16, 17

*Chavis v. Chappius*, 618 F.3d 162 (2d Cir. 2010) ............................. 14, 23

*Ciarpaglini v. Saini*, 352 F.3d 328 (7th Cir. 2003) .................... 10, 22, 23

*Coleman v. Tollefson*, 575 U.S. 532 (2015) ............................................ 17

*Cretacci v. Hare*, No. 21-5786, 2022 WL 17176781 (6th Cir. Nov. 23, 2022) ............................................................................................... 12

*Gibbs v. Roman*, 116 F.3d 83 (3d Cir. 1997), *overruled on other grounds by Abdul-Akbar v. McKelvie*, 239 F.3d 307 (3d Cir. 2001) ................. 16

*Hall v. United States*, 44 F.4th 218 (4th Cir. 2022) .................. 5, 6, 10, 21

*Ibrahim v. Dist. of Columbia*, 463 F.3d 3 (D.C. Cir. 2006) .................... 18

*Loumiet v. United States*, 948 F.3d 376 (D.C. Cir. 2020) ....................... 19

*Mitchell v. Fed. Bureau of Prisons*, 587 F.3d 415 (D.C. Cir. 2009) .. 18, 19

*Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157 (2004) .............. 19

*Pettus v. Morgenthau*, 554 F.3d 293 (2d Cir. 2009) ................................. 6

*Pinson v. U.S. Department of Justice*, 964 F.3d 65 (D.C. Cir. 2020) ... 5, 7, 15, 18, 20, 21, 22

*Prescott v. UTMB Galveston Texas*, 73 F.4th 315 (5th Cir. 2023) .......... 21

*Pullman-Standard v. Swint*, 456 U.S. 273 (1982) ................................. 16

*Shepherd v. Annucci*, 921 F.3d 89 (2d Cir. 2019) ................................... 16

*Taylor v. Watkins*, 623 F.3d 483 (7th Cir. 2010) ................................... 16

*Vandiver v. Prison Health Servs., Inc.*, 727 F.3d 580 (6th Cir. 2013) ... 19, 23

*Williams v. Paramo*, 775 F.3d 1182 (9th Cir. 2015) ............. 10, 14, 16, 22

**Statutes**

28 U.S.C. § 1915 ............................................................................ 21, 22

28 U.S.C. § 1915A ................................................................................ 22

42 U.S.C. § 1997e ................................................................................ 22

**Other Authorities**

Christie Thompson, The Marshall Project, & Joseph Shapiro, NPR, *How the Newest Federal Prison Became One of the Deadliest*, (May 31, 2022, 6:00 AM), https://www.themarshallproject.org/2022/05/31/how-the-newest-federal-prison-became-one-of-the-deadliest ..................... 13

*Fantastic, Merriam-Webster's Collegiate Dictionary* (11th ed. 2020) ..... 23

Joseph Shapiro*, A penitentiary unit will shut down after deaths, exposed by NPR and Marshall Project*, NPR (Feb. 15, 2023, 5:01 PM), https://www.npr.org/2023/02/15/1157279963/a-penitentiary-unit-will-shut-down-after-deaths-exposed-by-npr-and-marshall-proj .............. 13

**Rules**

Fed. R. Civ. Pro. 8 ................................................................................ 19

# GLOSSARY OF ACRONYMS

IFP:      In forma pauperis

PLRA:    Prison Litigation Reform Act

USP:      United States Penitentiary

# STATUTES AND REGULATIONS

Except for the following, all applicable statutes are contained in the Opening Brief of Amicus Curiae in Support of Appellant Tsunami Khan.

## 28 U.S.C. § 1915A(a)–(b)

**(a) Screening.**--The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.

**(b) Grounds for dismissal.**--On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint--

(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or

(2) seeks monetary relief from a defendant who is immune from such relief.

## 42 U.S.C. § 1997e(c)(1)

**(c) Dismissal**

(1) The court shall on its own motion or on the motion of a party dismiss any action brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.

## SUMMARY OF THE ARGUMENT

The government agrees on one critical fact—that Mr. Khan's risk of going completely blind from glaucoma constitutes a danger of serious physical injury. The government, however, proposes a redressability standard for nexus that would conflict with Congressional intent by turning the imminent danger assessment into a determination on the merits of the lawsuit. Even if redressability were required, the government misunderstands that requirement: A litigant need only show that the court can provide *relief* for the harm, not that the court could prevent the imminent dangers from coming to fruition.

Mr. Khan's allegations of impending blindness have a nexus to the claims in his complaint because he alleges the same harm: denied glaucoma treatment. And the district court can remedy that harm, either through damages or injunctive relief. In arguing that Mr. Khan fails the nexus test, the government misstates the core of Mr. Khan's glaucoma-related allegations as a plea for a particular form of treatment. What he actually alleges is a *denial* of consistent and specialized treatment prescribed by his doctors. It is not this Court's role to adjudicate the merits of his medical claims when assessing imminent danger.

The government also finds fault with the imminence of Mr. Khan's assault allegations. But it again mischaracterizes Mr. Khan's allegations by downplaying the role of prison officials in repeatedly instigating the assaults.  Throughout his filings, Mr. Khan alleges that prison officials continuously and intentionally placed him in housing units with violent and gang-affiliated people, demonstrating an ongoing danger at the time of his complaint and notice of appeal.

The government's proposal for a novel, unworkable framework for the imminent danger assessment—requiring this Court to constantly make factual determinations about complex medical conditions—has no support in either law or sense.  The government's proposal, which no circuit has adopted, misapplies and ignores § 1915(g) and the cases interpreting it.  This framework would require this Court to continuously reassess imminent danger throughout the appellate process.  It would impose a burden of production and persuasion on the pro se litigant while applying a presumption that the government's allegations are correct.

Not only would this proposed framework render the imminent danger exception a dead letter and contradict this Court's precedent, but it would significantly increase this Court's workload in assessing

imminent danger allegations. Reinvention of the imminent danger assessment is not necessary, because the Prison Litigation Reform Act (PLRA) provides ample mechanisms for screening meritless suits, and courts can reject imminent danger allegations that are conclusory or ridiculous. This Court should reject the government's framework and continue to apply its current law to this case.

## ARGUMENT

## I.  THE GOVERNMENT RECOGNIZES MR. KHAN'S IMMINENT DANGER OF BLINDNESS FROM GLAUCOMA EVEN WHILE ERRONEOUSLY CONTESTING NEXUS.

The government admits that Mr. Khan's "acquired blindness from worsening glaucoma poses a danger of serious physical injury." Gov't Br. at 35. It faults only the nexus between Mr. Khan's allegations of harm from the denied glaucoma treatment and his underlying complaint, arguing that nexus requires him to show that court action can redress the danger only by preventing it. Gov't Br. at 35. This Court should reject that standard. First, incorporating redressability into the nexus test for imminent danger claims would force courts to assess the merits of a case prematurely. Second, no court has adopted the test the government proposes: redressability as the prevention of harm. And even were this Court to adopt the only redressability test some courts have adopted, Mr. Khan satisfies it.

In arguing that Mr. Khan fails the nexus test, the government also mischaracterizes Mr. Khan's allegations. He is neither refusing glaucoma treatments nor asking for unreasonable treatments; he has been denied the treatments that his providers prescribed.

**A. Nexus does not require a showing of redressability for imminent danger allegations, but even if this Court adopts such a standard, Mr. Khan satisfies it.**

The government spends much of its brief arguing that § 1915(g) should include a nexus requirement, *see* Gov't. Br. at 29–34, a question that this Court has already answered in *Pinson v. U.S. Department of Justice*, 964 F.3d 65, 71 (D.C. Cir. 2020). *See id.* at 73 (adopting a nexus requirement without articulating the standard); Amicus Br. at 33. Without clearly defining its proposed test for establishing a nexus, the government argues that the PLRA requires plaintiffs to show that the court can redress their claims to proceed with *in forma pauperis* (IFP) status. *See* Gov't. Br. at 29–33, 35, 39.

This Court should reject that argument and hold, as the Fourth Circuit did in *Hall*, that a plaintiff establishes a nexus when their imminent danger allegations are connected or traceable to the claims in their complaint. *Hall v. United States*, 44 F.4th 218, 230–33 (4th Cir. 2022). In *Hall*, the court reasoned that incorporating redressability into the nexus test would force courts to prematurely examine the merits of a case to answer a mere threshold procedural question of whether a plaintiff could proceed IFP. *Id.* at 232. It considered such a requirement

5

"contrary to Congressional intent and a plain reading of the statute." *Id.* at 231. Much like the plaintiff in *Hall*, Mr. Khan complains of ongoing denied and delayed medical treatment, which has exacerbated his descent into blindness. Amicus Br. at 7–9. There is a direct line between Mr. Khan's alleged harms and his underlying complaint, making them sufficiently traceable to establish a nexus.

Even if this Court were to adopt a redressability standard, Mr. Khan would satisfy it. The government misunderstands redressability when it equates the standard solely with *prevention* of harm, an approach that no court employs. *See* Gov't Br. at 30–34. Even under the redressability standard in *Pettus v. Morgenthau*, which the government seems to endorse, Gov't Br. at 31–33, money damages are a form of judicial relief that redresses an alleged harm, thereby establishing a nexus to the underlying complaint. *See Pettus v. Morgenthau*, 554 F.3d 293, 297–300 (2d Cir. 2009). Nowhere does the *Pettus* opinion discuss preventing harm. Instead, the court held that a nexus exists when "a complaint seeks to redress an imminent danger that is fairly traceable to allegedly unlawful conduct complained of in the pleading." 554 F.3d at 298.

6

And while this Court noted in *Pinson* that the imminent danger exception *can* be used to "prevent[] future harms," it offered that only to describe one way that the plaintiff *could* have, but had not, established a nexus. *See Pinson*, 964 F.3d at 71 (quoting *Abdul-Akbar v. McKelvie*, 239 F.3d 307, 315 (3d Cir. 2001) (en banc)). Mr. Khan satisfies the test under both *Pettus* and *Pinson* because his complaint seeks remedies for denied glaucoma treatment—the same harm that places him in imminent danger.

## B. The government fails to address the core of Mr. Khan's allegations—that he was consistently denied necessary treatment for his glaucoma.

In arguing that Mr. Khan has not shown a nexus, the government would have this Court believe that Mr. Khan's allegations can be reduced to a frivolous request by an individual who refuses to heed sound medical advice. *See* Gov't Br. at 35–38. The government misses the point. The core of Mr. Khan's allegations is not that he has been receiving the *wrong* treatment. Rather, it is that he has not received the medical attention his doctors have recommended—*at all*. He alleges that ongoing delays in his eye drop refills, improper handling of his medications, and complete

lack of access to ophthalmologists from early 2021 up through his appeal have worsened his deteriorating condition. *See* Amicus Br. at 7–9.

The government mischaracterizes Mr. Khan's glaucoma-related claims as focused solely on medical cannabis. But Mr. Khan mentioned cannabis in only one exhibit before his Motion to Stay, which was filed after the time period relevant to the imminent danger assessment. *See* JA75; Motion to Stay or, in the Alternative, for Summary Reversal, Sept. 15, 2023, at 11–12. Nothing else in Mr. Khan's complaint, motion for leave to proceed IFP, notice of appeal, response to the show cause order, surreply, or supplement to the surreply makes any mention of cannabis. Far from seeking cannabis, in all his pleadings, Mr. Khan primarily alleges denials of necessary, specialized ophthalmological care; denials of glaucoma medication by prison staff; and contamination of what glaucoma medication he did receive. JA10, JA14–15, JA40–41, JA72, JA116–117, JA124.

The government says that Mr. Khan "does not want any of the other treatment he would be offered or that he would receive." Gov't Br. at 38. This is wrong. The government misuses an isolated incident from 2019 to accuse Mr. Khan of causing his own blindness. *See* Gov't Br. at 38.

But Mr. Khan underwent surgeries pursuant to the advice of ophthalmologists as recently as late 2020, just before his last contact with an ophthalmologist in early 2021. *See* JA75. In the time period most relevant to this case, though Mr. Khan was offered neither surgery nor access to an ophthalmologist at United States Penitentiary (USP) Thomson, he complied with his doctors' advice to the extent he could. *See*, e.g., JA10–11, JA40–41, JA116–17.

The government is also mistaken when it accuses Mr. Khan of "misinterpret[ing] his doctor's note as indicating that any surgery could cause him to go blind." Gov't Br. at 36. Mr. Khan alleges that he is not receiving his prescribed treatments at all, including surgery, as he has not seen any ophthalmologist since 2021—let alone one who can perform the *particular* surgery he needs. JA40, JA116–17.

Mr. Khan's condition is complicated, and he knows much more about it than the government's attorney or anyone else, short of his doctors. Despite this fact, the government goes to great lengths to articulate what it believes would be appropriate treatment for Mr. Khan. The government's attempt to assume the role of physician, invoking no less than four medical journal articles, demonstrates the flaw in having

judges and lawyers exert medical expertise over this matter. *See* Gov't Br. at 36–38. This Court should not have to make judgments about newly introduced and unvetted medical documents that were not supplied by Mr. Khan's physicians. *See* Amicus Br. at 35–40; *Williams v. Paramo*, 775 F.3d 1182, 1190 (9th Cir. 2015).

Determining the correct treatment for Mr. Khan's glaucoma is not the government attorney's role, nor is it this Court's. *See Hall*, 44 F.4th at 232; *Andrews v. Cervantes*, 493 F.3d 1047, 1055 (9th Cir. 2007); *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003) (explaining that IFP determinations are not the appropriate place for courts to "fine-tune what is 'serious enough' to qualify for the [imminent danger] exception"). Congress did not intend the PLRA's imminent danger exception to require appellate courts to make factual findings from medical documents or assess the credibility of expert opinion on complicated medical matters. *See Williams*, 775 F.3d at 1189–90 (warning against overly detailed inquiries that would spawn mini-trials).

## II.   THE GOVERNMENT DOWNPLAYS THE ROLE OF PRISON OFFICIALS IN FACILITATING AND ENCOURAGING ASSAULTS AT USP THOMSON.

The government acknowledges Mr. Khan's allegation that prison staff orchestrated assaults at USP Thomson, but it argues that these assaults were isolated incidents, lacking sufficient imminence to satisfy § 1915(g).  Gov't Br. at 39–43.  It does so first by downplaying the role prison officials played in instigating these assaults and then by refusing to acknowledge the ways in which Mr. Khan's assailants were, in fact, connected to one another.

Throughout his filings, Mr. Khan describes prison officials as key actors who incited several of his cellmates to repeatedly assault him, creating an ever-present risk of imminent danger.  *See* Amicus Br. at 10–15.  The government sidesteps the role of prison officials, and instead insists that there was no pattern of assaults by any one person.  Gov't Br. at 41.  Charting its own timeline of events, the government isolates three "discrete insults" by two perpetrators from Mr. Khan's full account—which spans more than eleven years—and argues that these incidents

11

are insufficient to create a pattern.  Gov't Br. at 39–41.[1]  But these were not mere "insults"—they were assaults and menacing threats on Mr. Khan's life.  The government's argument about these assaults and threats fails for two reasons.

First, while the government emphasizes that Mr. Khan was separated from each of his assailants after each attack, these were not isolated incidents—they were related to each other.  Gov't Br. at 41–42.  Mr. Khan alleges that prison officials retaliated against him for his legal complaints and requests for treatment by deliberately placing him in proximity with violent people while spreading malicious rumors that he was a child molester and a "rat."  JA11–13, JA15–18, JA35, JA37–40, JA58.  This is fundamental to demonstrating the ongoing pattern at play in Mr. Khan's case.

Mr. Khan's allegations do not exist in a vacuum.  Indeed, a report has documented that correctional officers regularly targeted those incarcerated at USP Thomson—one of the deadliest prisons in America

---

[1] The only case the government cites to support its argument is an unpublished Sixth Circuit case outside of the imminent danger context. *See generally Cretacci v. Hare*, No. 21-5786, 2022 WL 17176781 (6th Cir. Nov. 23, 2022) (discussing the Fourteenth Amendment excessive force standard for a sufficient pattern of inaction by prison officials).

while Mr. Khan was there.[2]  Like Mr. Khan, others have alleged that "officers stoked tensions between cellmates and intentionally paired men who they knew would attack each other."[3]  According to the Marshall Project, there have also been reports of "officers spread[ing] the false information that [an incarcerated person] was a sex offender, inciting physical and sexual assault from multiple cellmates."[4]  Since the writing of the Marshall Project's report, the unit Mr. Khan lived in has been closed.[5]  Correctional officers deliberately created the dangerous and antagonistic atmosphere that led to the repeated threats and assaults against Mr. Khan.

---

[2] Christie Thompson, The Marshall Project, & Joseph Shapiro, NPR, *How the Newest Federal Prison Became One of the Deadliest*, (May 31, 2022, 6:00 AM), https://www.themarshallproject.org/2022/05/31/how-the-newest-federal-prison-became-one-of-the-deadliest.  Mr. Khan arrived at USP Thomson in April 2022, shortly before the release of this report, which chronicles ongoing assaults and homicides by a combination of prison officials and other incarcerated people.

[3] *Id.*

[4] *Id.*

[5] Joseph Shapiro*, A penitentiary unit will shut down after deaths, exposed by NPR and Marshall Project*, NPR (Feb. 15, 2023, 5:01 PM), https://www.npr.org/2023/02/15/1157279963/a-penitentiary-unit-will-shut-down-after-deaths-exposed-by-npr-and-marshall-proj.

Second, there were at least *four people* who assaulted and threatened to assault Mr. Khan during the relevant time period, and they were all from the same gang-affiliated unit. JA12, JA16–19, JA35, JA37, JA39. The government refuses to acknowledge these facts that make Mr. Khan's case strikingly similar to plaintiffs who have qualified for the imminent danger exception. *See Williams*, 775 F.3d at 1190 (holding that ongoing threats motivated by prison officials spreading rumors that the plaintiff was a sex offender amounted to imminent danger); *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (holding that a recent assault combined with three subsequent threats, all involving correctional officers, was "clearly the sort of ongoing pattern of acts that satisfies the imminent danger exception"). The correctional officers' involvement in fomenting violence between Mr. Khan and several people from a particularly violent unit—even after he was removed from that unit—created a web of imminent danger, placing Mr. Khan in continuous peril.

## III.  THE GOVERNMENT'S PROPOSALS WOULD TRANSFORM THE IMMINENT DANGER EXCEPTION INTO AN UNWORKABLE STANDARD.

The government asks this Court to adopt a novel scheme—not used by any circuit—for evaluating imminent danger. It would require this

14

Court to engage in a complex and continuously re-evaluated evidentiary analysis of imminent danger allegations in every appeal.  This has no support in either the PLRA or the cases interpreting it.  For example, the government argues that § 1915(g) imposes a burden of production and persuasion on pro se litigants.  That proposal contradicts this Court's precedent construing the imminent danger requirement as a mere pleading standard.  Not only is the government's scheme unworkable, but it is also unnecessary, because courts already have mechanisms for screening frivolous claims.

### A.  The government's proposed standard is unsupported and contradicts established law.

The government suggests that the PLRA's assignment of "atypical roles" to appellate courts allows the government to dispute imminent danger claims with declarations, prison records, and medical literature introduced for the first time on appeal.  Gov't Br. at 23 (citing *Pinson*, 964 F.3d at 70); *see also id.* at 21–24.  But *Pinson* makes clear that the "atypical role" of appellate courts is to consider new imminent danger *allegations* raised on appeal; it says nothing about appellate courts assuming the fact-finding role properly given to trial courts.  *See Pinson*, 964 F.3d at 70.  Appellate courts are not fact-finding courts, and the

15

government fails to properly explain why this Court should depart from that bedrock principle. *See, e.g., Pullman-Standard v. Swint*, 456 U.S. 273, 291–92 (1982).

Although other circuits have held that *district courts* may hold limited evidentiary hearings on imminent danger allegations—a questionable interpretation that is not at issue in this case—no court of appeals has given *itself* that power. *See Shepherd v. Annucci*, 921 F.3d 89, 94–95 (2d Cir. 2019); *Gibbs v. Roman*, 116 F.3d 83, 86–87 (3d Cir. 1997), *overruled on other grounds by Abdul-Akbar v. McKelvie*, 239 F.3d 307, 312 (3d Cir. 2001); *Taylor v. Watkins*, 623 F.3d 483, 485–86 (7th Cir. 2010); *see also Williams*, 775 F.3d at 1189–90 (cautioning against "overly detailed inquiry" on imminent danger because an appellate court, "unlike a district court, is ill-equipped to engage in satellite litigation and adjudicate disputed factual matters.")

The government's reliance on *Ball v. Famiglio* is misplaced. *See* Gov't Br. at 23–24 (citing *Ball v. Famiglio*, 726 F.3d 448 (3d Cir. 2013), *partially abrogated on other grounds by Coleman v. Tollefson*, 575 U.S. 532 (2015)). *Ball* did not involve an appellate court considering new evidence introduced for the first time on appeal to rebut a plaintiff's

imminent danger allegations. It instead was a case that had "proceeded through discovery and was disposed of on defendant's motions for summary judgment" in the district court. 726 F.3d at 470. The Third Circuit was assessing whether the plaintiff had established imminent danger to proceed on appeal IFP, but that determination was based on the *district court's* fully developed factual record, which included testimony and medical records. *Id.* at 468–70.[6]

Nor does the government offer this Court any principled guidance about how, if it takes on a factfinder role, it should address the conflicts between Mr. Khan's allegations and the government's when assessing imminent danger. Its solution appears to be that "any disputed facts should be construed, as at summary judgment, in the light most favorable to the non-movant (here, the government)." Gov't Br. at 19. But that

---

[6] To support its proposed extension, the government also cites to stray language in *Coleman v. Tollefson*, 575 U.S. 532, 539 (2015), that cautions against PLRA interpretations that "produce a leaky filter." Gov't Br. at 23. The government's proposed method to stop the "leak" is to create a standard that would clog the filter entirely. There is no leaky filter in this case, only this Court's settled precedents—which favor granting Mr. Khan IFP status. Moreover, the *Coleman* Court was addressing the question of whether a prior dismissal qualified as a strike; it was not interpreting the imminent danger provision, which exists as an *exception* to the three-strikes rule. *See Coleman*, 575 U.S. at 539.

presumption in the government's favor would contradict this Court's precedents: Pro se plaintiffs' imminent danger allegations are construed liberally and assumed true when determining IFP status. *Pinson*, 964 F.3d at 70; *Ibrahim v. Dist. of Columbia*, 463 F.3d 3, 6 (D.C. Cir. 2006); *Asemani v. U.S. Citizenship & Immigration Servs.*, 797 F.3d 1069, 1075 (D.C. Cir. 2015); *Mitchell v. Fed. Bureau of Prisons*, 587 F.3d 415, 420 (D.C. Cir. 2009). The government's proposal is a breathtaking departure from settled law.

This Court has never held that § 1915(g) puts a burden of production, much less of persuasion, on an incarcerated litigant. *Contra* Gov't Br. at 18. The government's reliance on *Mitchell* is misplaced; the passage it quotes concerns the *specificity* of imminent danger pleadings, not a burden of production or persuasion. Gov't Br. at 18; *see Mitchell*, 587 F.3d at 421–22 (explaining that plaintiffs must allege something more specific than "general allegations of endangerment").

Section 1915(g) does not require *plaintiffs* to defeat summary judgment in favor of the *government*. It is instead a pleading standard in favor of IFP applicants like Mr. Khan. *See, e.g.*, *Ibrahim*, 463 F.3d at 6 ("In determining whether he qualifies [for the imminent danger

exception], we look to the complaint."); *Mitchell*, 587 F.3d at 420 ("[W]hen considering IFP eligibility, we shall continue using the traditional standards applicable to pleadings by pro se prisoners."); *Asemani*, 797 F.3d at 1075 (emphasis added) ("We must determine whether the facts *alleged by Asemani* demonstrate that he faced 'imminent danger of serious physical injury.'"); *Vandiver v. Prison Health Servs., Inc.*, 727 F.3d 580, 585 (6th Cir. 2013) ("[T]he imminent danger exception is essentially a pleading requirement subject to the ordinary principles of notice pleading."). No one would suggest that a plaintiff has a burden of production and persuasion in their complaint. *See generally* Fed. R. Civ. Pro. 8(a). Likewise, a plaintiff should not have that burden in their imminent danger allegations. This Court should not create such an onerous requirement for a threshold procedural inquiry over when a filing fee is paid.[7]

_____

[7] The government mines quotes from unrelated areas of law in trying to shore up its backward reading of the PLRA. *See* Gov't Br. at 20, *citing, e.g.*, *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 175 (2004) (Freedom of Information Act case); *Loumiet v. United States*, 948 F.3d 376, 385 (D.C. Cir. 2020) (challenging allegedly retaliatory agency enforcement actions against a bank's lawyer). None of these cases interprets the PLRA or involves a threshold procedural inquiry such as the timing of a filing fee. And more importantly, the government offers

Even worse, the government proposes another novel standard requiring a pattern of dangers to persist long past both the complaint and the notice of appeal—and requiring courts to continuously assess that pattern of dangers throughout the entire lawsuit. Gov't Br. at 25–29, 42–43. The government argues that if an imminent danger abates in any way during the life of a lawsuit, IFP status should be revoked. Gov't Br. at 28, 42–43. This is not how this Court, or any court, has interpreted the PLRA's imminent danger exception.

This Court and others have consistently held that the ongoing nature of an imminent danger need only be assessed at the time the complaint and notice of appeal were filed—in this case, June 22 and August 30, 2022—and any changes in circumstances after that are irrelevant.[8] *See, e.g.*, *Pinson*, 964 F.3d at 69–70 (holding "the conditions prisoners faced at the time of noticing their appeals determine their

---

no reason to suggest that it has any expertise requiring deference to its assessment of imminent danger.

[8] Mr. Khan's September 15, 2023 motion to stay his appeal is one such irrelevant circumstance raised by the government. *See* Gov't Br. at 15, 42. Even were this in the relevant time period, the government's characterization is wrong. Mr. Khan's motion asked only for remand to add further allegations to the record to ensure that he could proceed with his lawsuit IFP. *See* Motion to Stay or, in the Alternative, for Summary Reversal, Sept. 15, 2023, at 19.

eligibility to proceed under the exception.”); *Hall*, 44 F.4th at 224, 232 (assessing imminent danger “at the time of filing”); *Andrews*, 493 F.3d at 1053 (holding plaintiff's release from prison after filing complaint “irrelevant to our § 1915(g) analysis”); *Prescott v. UTMB Galveston Texas*, 73 F.4th 315, 321 (5th Cir. 2023) (determining imminent danger as if plaintiff were still housed in the unit where he filed his appeal despite subsequent transfer).

Finally, highlighting Mr. Khan’s other cases, Gov’t Br. at 3–11, the government asks this Court to assess imminent danger differently depending on how many cases an incarcerated person has previously filed. *See id.* at 19–20. The text of § 1915(g) does not support this distinction. Every litigant alleging imminent danger to proceed IFP has had at least three prior cases dismissed for being frivolous, malicious, or failing to state a claim. *See* 28 U.S.C. §§ 1915(e)(2)(B), (g). Whether Mr. Khan faced imminent danger when he filed *this* complaint and *this* appeal turns on the facts of *this* case because imminent danger is a time- and fact-specific inquiry. *See, e.g., Pinson*, 964 F.3d at 69.

**B.  This Court already has tools to screen meritless cases, rendering the government's proposals superfluous.**

Neither Amicus nor Mr. Khan asks this Court to uncritically accept every imminent danger allegation it sees.  *Contra* Gov't Br. at 20, 24–25. Courts can protect themselves from abusive filers and frivolous claims without contorting § 1915(g) from a filing fee provision into a continuously revisited merits determination.  The PLRA has other mechanisms to screen out meritless lawsuits; that is not the purpose of the imminent danger exception.  *Ciarpaglini*, 352 F.3d at 331 ("[Section] 1915(g) is not a vehicle for determining the merits of a claim.").

The PLRA tasks the district court with assessing the complaint's merits separately from the imminent danger inquiry; it is encouraged to do this before the case is even docketed.  *See* 28 U.S.C. §§ 1915(e)(2)(B), 1915A(a)–(b)(1); 42 U.S.C. § 1997e(c)(1).  The imminent danger exception is a safety valve for the constitutional concerns raised by the three-strikes rule.  *See Pinson*, 964 F.3d at 71; *Williams*, 775 F.3d at 1189. Because the PLRA has specified provisions to screen out meritless cases, it cuts against the legislative intent to turn one of the few provisions that *preserve* incarcerated persons' access to courts into a merits barrier.  *See*

22

*Williams*, 775 F.3d at 1189 ("Any extension of § 1915(g)'s provisions should cause us to proceed with caution.").

Beyond the statute's text, courts may deny IFP status for claims of imminent danger that are "conclusory or ridiculous, or are clearly baseless (i.e. are fantastic or delusional and rise to the level of irrational or wholly incredible)." *Vandiver*, 727 F.3d at 585 (citation omitted); *accord Chavis*, 618 F.3d at 170; *Ciarpaglini*, 352 F.3d at 331. The government's nonsensical "Witchy Warden" hypothetical, Gov't Br. at 24–25, 28–29, is easily dealt with by these principles without requiring appellate courts to assume a fact-finding role. Allegations of witches and curses are the very definition of "fantastical." *Fantastic, Merriam-Webster's Collegiate Dictionary* (11th ed. 2020).

Mr. Khan's allegations of assault and denied glaucoma treatments are not rooted in fantasy or unreality. They stem from very real allegations about his dangerous situation: prison officials at USP Thomson prevented him from seeing an ophthalmologist, denied him medication, and intentionally provoked other incarcerated people to assault him. Amicus Br. at 6–15. These allegations are not fantastical. They are tragically authentic.

## CONCLUSION

For the foregoing reasons, this Court should permit Mr. Khan to proceed on appeal IFP, reverse the district court's denial of Mr. Khan's IFP status and the dismissal of his complaint, and remand.

Respectfully Submitted,

*/s/ Erica Hashimoto*
Erica Hashimoto
*Director*

Eva Shell
*Supervising Attorney*

Alexis R. Casanas
Sonia Geba
*Student Counsel*

Georgetown University Law Center
Appellate Litigation Program
111 F Street NW, Suite 306
Washington, D.C. 20001
(202) 662-9555
eh502@law.georgetown.edu

Counsel for Amicus Curiae in
Support of Appellant

Dated: February 29, 2024

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 4,569 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

Respectfully Submitted,

*/s/ Erica Hashimoto*
Erica Hashimoto

Georgetown University Law Center
Appellate Litigation Program
111 F Street NW, Suite 306
Washington, D.C. 20001
(202) 662-9555
eh502@georgetown.edu

Counsel for Amicus Curiae in
Support of Appellant

Dated: February 29, 2024

# CERTIFICATE OF SERVICE

I, Eva Shell, certify that on February 29, 2024, I electronically filed the foregoing Amicus Reply Brief via this Court's CM/ECF system, which will send notice of such filing to counsel of record for the Appellees, and I served the Appellant, Tsunami Khan, also known as Michael S. Owlfeather-Gorbey, by mailing a copy of this motion to:

> Michael Gorbey
> BOP #33405-013
> USP Victorville
> U.S. Penitentiary
> P.O. Box 3900
> Adelanto, CA 92301.

*/s/ Eva Shell*
Eva Shell
*Supervising Attorney*

Georgetown University Law Center
Appellate Litigation Program
111 F Street NW, Suite 306
Washington, D.C. 20001
(202) 662-9555
es1717@georgetown.edu

Counsel for Amicus Curiae
in Support of Appellant